982 So.2d 565 (2006)
Anthony Eugene BROWN
v.
STATE.
CR-01-1900.
Court of Criminal Appeals of Alabama.
April 28, 2006.
Rehearing Denied August 11, 2006.
Certiorari Denied October 12, 2007.
*571 Matthew C. Lamere, Dothan, for appellant.
William H. Pryor, Jr., and Troy King, attys. gen., and Michael A. Nunnelley and Stephen Shows, asst. attys. gen., for appellee.
Alabama Supreme Court 1051687.
McMILLAN, Presiding Judge.
The appellant, Anthony Eugene Brown, was convicted of capital murder for the intentional murder of Virginia Keel during the commission of a burglary in the first degree, in violation of § 13A-5-40(a)(4), Ala.Code 1975. Brown had entered pleas *572 of not guilty and not guilty by reason of mental disease or defect. By a vote of 10 to 2, the jury returned an advisory verdict of death. Thereafter, the trial court held a separate sentencing hearing and sentenced Brown to death.
Following the sentencing hearing before the trial court, the trial judge issued an order including a summary of the crime and Brown's participation in it. The order summarized the facts of the offense as follows:
"On June 19, 2000, Anthony Eugene Brown did cause the death of Virginia Keel, an eighty-three year old female, by strangling Mrs. Keel with a piece of cloth and by placing cloth as well as tape over her mouth and nostrils. This offense occurred at 22 Trillium Circle, Apartment Number 1007, Dothan, AL., during the course of Anthony Brown unlawfully entering the residence of Virginia Keel.
"Dothan Police Department Records indicate that on June 19, 2000, at approximately 10:56 a.m., the Communications Center received a `911 Call' from Marisa Bowden at the Holiday Inn South, 2195 Ross Clark Circle, Dothan Al. Ms. Bowden reported that a black male with a gun had approached Room 119 and threatened the occupants. Ms. Bowden described the person as black male, approximately 5'10" weighing approximately 160 pounds, and wearing a T-shirt as well as tan pants.
"Corporal Scott Heath was dispatched to the Holiday Inn South and arrived at 11:07 a.m. Witnesses at the scene advised Corporal Heath that the suspect was last seen behind the Hardee's Restaurant headed toward Fieldcrest Apartments.
"Officer Jason Youngblood arrived at Fieldcrest Apartments at approximately 11:10 a.m. and spoke to a maintenance worker at the building. Mr. Tommy Bryan advised Officer Youngblood that he had seen a person matching the descriptions of the suspect walk into the breezeway of Building No. 22 at the Fieldcrest Apartment complex. Building No. 22 consisted of Apartments 1001 through 1008. Officer Youngblood requested that Barbara Rosen, the Apartment Manager, bring the keys to the eight doors in Building No. 22. Corporal Heath and Officer Gill had arrived on the scene. Corporal Heath observed the blinds move on the sliding glass doors in Apartment No. 1007. The officers also observed that the television, which they had heard playing earlier in the apartment, had stopped playing.
"Officer Youngblood obtained the key to Apartment No. 1007 from Ms. Barbara Rosen. The officers knocked on the door of Apt. No. 1007 and did not get anyone to answer the door. The officers unlocked the door and found the chain lock to be latched. The officers then identified themselves as officers of the Dothan Police Department. After still not getting anyone to come to the door, Officer Youngblood forced the door open.
"Officer Youngblood and Corporal Heath then entered the apartment and observed a black male in the kitchen area of the apartment. The black male stated to the officers, `You've got me, you've got me. I did not do anything to her, she is just tied up in there.' Officer Youngblood then secured the black male by handcuffing him. The subject was identified as Anthony Eugene Brown and was placed in the back of Officer Gill's patrol unit.
"Officer Youngblood then went to the bathroom area and found Virginia Keel, an elderly female, on the floor. Mrs. Keel's hands were wrapped approximately *573 six times with an extension cord and tied with a knot. Mrs. Keel's hands were connected to her feet with one strand of cord and the cord was not long enough for Mrs. Keel to be able to stretch out her legs. A portion of a T-shirt had been stuffed in Mrs. Keel's mouth, and black duct tape had been wrapped around Mrs. Keel's head approximately fifteen to twenty times. The remaining portion of the T-shirt was tied around Mrs. Keel's neck in a single knot. The knot was tied so tight that Corporal Heath could not untie the knot and he had to cut the knot.
"Corporal Heath and Officer Youngblood immediately started CPR on Mrs. Keel and continued CPR until the paramedics arrived on the scene. The paramedics started advanced life support on Mrs. Keel, and she was transported to the Southeast Alabama Medical Center.
"Upon arrival at the hospital, Dr. David Williams treated Mrs. Keel. He noted Mrs. Keel to be in status epilepticus, and he initiated anti-seizure therapy. Mrs. Keel was unresponsive, and her prognosis was poor. On June 29, 2000, Mrs. Virginia Keel died at the Southeast Alabama Medical Center Intensive Care Unit as a result of injuries that she had received on June 19, 200[0].
"On June 19, 2000, at approximately 3:00 p.m., Sgt. Michael Cirulli and Investigator Michael Etress interviewed Anthony Eugene Brown at the Dothan Police Department in Dothan, AL.
"Mr. Brown stated that he had no address and was sleeping in railroad cars. He stated that he walked to the Holiday Inn Southside in Dothan, Alabama, and went to one of the motel rooms. Brown stated that he knocked on the door, and a man came to the door. The subject stated that he asked the man if he could talk with him, and the man told him no and to get out of his room. Brown stated that he got mad and pulled a .38 caliber chrome-plated revolver out of his right pants pocket. He stated that the man then started saying that he did not have any money.
"Mr. Brown stated that he then went behind the motel through a wooded area to an apartment complex. The subject saw, through the sliding glass doors, a lady sitting in a chair inside her apartment. The subject stated that he was going to rob the lady and went to knock on her door. The subject stated that the lady came to her door and that he just walked into the apartment. He stated that the lady tried to push him back out the door. Brown stated that he pushed his way on in the apartment and closed the door behind him.
"The subject stated that he told the lady that he needed $500 real bad and that he was going to get himself some dope. Brown stated that the lady told him that she did not have any money. He stated that he then pulled the .38 caliber pistol out of his pocket and said, `[L]isten to me, don't make me kill you, I need some money bad.' Brown stated that he was pointing the pistol at the lady's forehead at this time.
"The subject stated that the lady tried to run to the door twice, but he grabbed her. Brown stated that he tied the lady up with an extension cord and laid her on the floor in a closet. He stated that he tied her hands and feet together, behind her back. Brown stated that she was moaning and asking him not to kill her.
"Mr. Brown stated that the lady was screaming and that he tied a shirt around her mouth in order to make her be quiet. He stated that she kept on moaning and that he went into the kitchen where he found some tape. Brown *574 stated that he took the black electrical tape and wrapped it around her mouth. He stated that he took the tape off her nose in order that she could breathe. Brown stated that the lady told him that she was hot, and he then moved her from the closet to the bathroom where she could get some air.
"The subject stated that the police showed up at the apartments and started ringing the phone. Brown stated that he heard the police knocking on the door. Brown stated that the officers entered the apartment and went straight on into the back. The subject stated that he pointed his gun at the officers, but they did not see him. The subject stated that he was lying on the floor in the kitchen, and he then placed the gun in a garbage can. Brown stated that the officers came back up to where he was and the officers placed handcuffs on him. The subject stated that he told the officers that there was a lady tied up in the bathroom."

I.
Brown argues that the trial court erred by refusing to submit the issue of his competency to stand trial to a jury for its determination. The record indicates that, before trial, Brown filed a motion for a mental evaluation, requesting that a qualified mental-health professional determine his mental condition and competency to stand trial, as well as his mental condition at the time of his offense and at the time he waived his constitutional rights in giving his statement to the authorities. Defense counsel argued in the motion that Brown had informed him that he had previously been treated for mental illness and that he was continuing to suffer from mental illness. Brown's motion made no request for a competency hearing by the jury. Thereafter, the circuit court ordered that Brown undergo a mental examination to determine, among other things, his competency to stand trial, specifically "pertaining to his present ability to understand the nature and object of the proceedings against [him] and his ability to assist defense counsel reasonably in the preparation of his defense." Pursuant to this order, Brown was admitted to Taylor Hardin Secure Medical Facility, where he was examined for just under 30 days by Dr. James Hooper. The lengthy report contained in the record suggests that Brown demonstrated a great deal of problematic behavior, that he attempted suicide, and that he was highly manipulative during his stay. Brown was closely observed, and Dr. Hooper concluded that he "was able to demonstrate adequate knowledge of courtroom procedures and personnel."
Approximately a year later, Brown filed a "Motion for Bifurcate Trial of Issues of Criminal Responsibility and Innocence," arguing that he was entitled to separate juries because of his two pleas. Specifically, he argued that the same jury should not hear the evidence that he was insane at the time of the offense that would hear the evidence promoting his innocence. However, no mention was made of his competency to stand trial. The trial court subsequently denied that motion. Shortly after that motion was denied, the State entered a "Motion for Evaluation of Competency to Stand Trial and Mental State at the Time of the Offense," asking the court to order a mental evaluation of Brown by Dr. Doug McKeown. The purpose was to evaluate Brown's competency to stand trial because, although his most recent evaluation, from the prior year, found him to be competent, Brown had been tested by Michael D'Errico, a defense-obtained expert, who had provided no report. The trial court granted this order, and Brown was once again sent to Taylor Hardin Secure *575 Medical Facility for evaluation and examination by Dr. McKeown.
Dr. McKeown concluded that, although Brown had some psychological difficulties, he was competent to go to trial and could participate in judicial proceedings and could interact with counsel. Approximately a month later, Brown filed a written objection to the court's order requiring the same jury be used to determine his competency and to hear the case-in-chief. This objection refers to an order of the trial court holding that a jury would be empaneled to hear the competency issue and, if Brown was to be found competent, the same jury would be used for the case-in-chief. In the motion, Brown argued that he had timely raised the issue of competency, and he "demanded a jury trial of the issue of competency," pursuant to Rule 11.6(c)(1), Ala. R.Crim. P.
The State filed a written objection to a trial by jury on the issue of competency to stand trial in response to Brown's objection, arguing that because Brown never requested a jury to determine competency, he did not preserve this right, and citing Rule 11.6. The State's objection noted that Brown's "Motion for Bifurcate Trial" did not contain a request for a jury determination of his competency and was filed almost a year after his motion seeking a mental evaluation. The State argued that Brown had thereby waived his right to a jury trial on the competency issue.
The following day, as a number of issues were being heard, defense counsel raised the matter of whether a jury would be allowed to determine competency. The trial court responded that it had reviewed the briefs of both parties on the matter, as well as the Alabama Rules of Evidence, and had concluded that Brown's motion for jury determination was untimely. Defense counsel objected to the trial court's denial of the motion, noting that the trial court had previously ordered that a jury determine competency although the same jury would thereafter try Brown in the case-in-chief. The trial court responded as follows:
"At the time I thought you had good grounds for it, and that's why I granted it. The State pointed out to me, which I didn't know, there's certain requirements when to file it, and it was filed untimely, and I have to go by what the law says."
Defense counsel responded that any error in the failure to request a jury determination of competency when he had moved for the mental evaluation, was cured by the State's subsequent motion for mental evaluation to determine competency. The prosecutor responded that although the State had requested a competency determination in preparing for trial, the State did not request a jury trial as to the matter. The prosecutor thus argued that Brown did not meet the guidelines of the Alabama Rules of Criminal Procedure, because they did not file a jury request on time and, therefore, were not entitled to a jury determination. The trial court then denied Brown's motion, but stated that Brown would be given a competency hearing by the court. The same day Brown filed a written objection to this denial by the trial court of the jury trial as to competency to stand trial. In that motion, Brown argued that the State had incorrectly argued that he had waived his right to jury trial as to competency, because the State had in fact waived its right to object to the trial court's granting of Brown's motion for a jury trial as to competency, because of the untimeliness of the State's objection. Brown further argued that the State had "raised anew the issue of [Brown's] competency" when it had filed its request for mental evaluation so that "at that time, [Brown] had an unruled *576 upon motion" before the trial court requesting a jury trial concerning competency. Finally, three days later, a thorough competency hearing was held before the trial court, following which the trial court found that, based on the evidence presented at the hearing, Brown was competent to stand trial.
Brown did not comply with Rule 11.6(b)(1), Rule 11.2(c), or Rule 11.7(c), Ala. R.Crim. P. Rule 11.6(b)(1), that provides as follows:
"The circuit court shall notify the defendant, the defendant's attorney, and the district attorney, in writing, of the date and the time of the competency hearing. Unless the defendant or the defendant's attorney files a written demand for a jury trial, pursuant to Rule 11.2(c) or within seven (7) days after the defendant's attorney is notified that the competency issue has been raised by the court or by motion of the district attorney pursuant to [Rule] 11.2(a), the circuit judge shall determine whether the defendant is competent to stand trial."
Thus, unless Brown had filed a written demand for a jury trial pursuant to Rule 11.2(c), Ala. R.Crim. P., or filed a written demand within seven days of his notification of the raising of the competency issue by the court or district attorney, the trial court should properly determine competency. See also Rule 11.7(c), Ala. R.Crim. P.
Rule 11.2(c) requires that
"[a] motion filed pursuant to this rule shall state facts upon which the mental examination is sought, and such a motion filed by the defendant or the defendant's attorney must include a written demand for a jury in order to preserve the right to a jury in a subsequent competency hearing conducted pursuant to Rule 11.6; see also Rule 11.6(b)(1) and Rule 11.7(c)."
Thus, in order to properly move for a determination of competency by a jury, Brown was required to include a written demand for a jury determination within his motion seeking mental examination or to make a written demand for a jury trial within seven days of notification that the competency issue has been raised by the trial court or district attorney. In the present case, Brown did not include a request for jury determination in his motion seeking mental examination; he also did not make a written request for jury determination within seven days of notification that the State had moved for a determination of competency. Therefore, Brown failed to preserve his right to a jury competency hearing.
Furthermore, a thorough review of the evidence presented at the competency hearing, including the testimony of experts who had examined Brown and the reports of their evaluations and examinations, as well as the testimony of prison officials who had observed and dealt with Brown on a daily basis around the time of trial, indicates that the trial court properly found that Brown was competent to stand trial. The record indicates that Brown had a rational and factual understanding of the proceedings against him, and he was able to consult with his lawyers. Rule 11.1, Ala. R.Crim. P.; Nicks v. State, 783 So.2d 895, 909 (Ala.Crim.App.1999), cert. quashed, 783 So.2d 926 (Ala.2000). Therefore, the record indicates that Brown did not suffer any prejudice by having his competency hearing before the trial court, rather than a jury.

II.
Brown argues that the trial court abused its discretion and erred to reversal by failing to order a mental evaluation for purposes of determining whether he was *577 competent to stand trial. Brown argues that the trial judge advised him that the judge had already made a "preliminary determination" that Brown was competent to stand trial; however, Brown argues that a "pseudo hearing" was held. Brown further contends that, after the trial judge determined that he was competent, he improperly denied a motion to suspend the hearing in order to determine Brown's present ability to proceed with trial.
The record indicates that Brown was arrested on June 29, 2000, for the capital murder of Virginia Keel, and that he was subsequently arraigned for this charge on October 11, 2000. On November 3, 2000, the circuit court ordered Brown to undergo a competency determination, and on November 30, 2000, he was admitted to Taylor Hardin Secure Medical Facility. After approximately 30 days of examination and evaluation, Brown was determined to be competent to stand trial. Later, on August 11, 2001, Michael D'Errico evaluated Brown pursuant to a court order in response to a motion by Brown. The defense expert subsequently evaluated Brown on November 29, 2001. This expert made no written report of his evaluation; however, he concluded that Brown was not competent to stand trial. Finally, Brown was again sent to Taylor Hardin Secure Medical Facility for evaluation of competency pursuant to a court order, and he was evaluated by Dr. Doug McKeown on January 7, 2002. On April 12, 2002, after the jury was struck for trial, defense counsel brought up a motion he had filed apparently alleging that the trial court had already determined that Brown was competent, without ever having conducted a hearing. The trial court stated that he had reviewed the reports and examinations by psychiatrists and doctors who had evaluated Brown. The trial court stated:
". . . I've read those reports before trial. Obviously, I do that in every case. And I'm not saying I've got a predetermination of what I'm going to rule in that case. But from what I've read, those reports show that more than likely Mr. Brown is competent to stand trial. Now, I certainly have not heard all the evidence in the case. And I need to obviously hear the doctors in person. But, you know, if there is some  and I guess that's the basis of the motion that I've already made my mind up. . . . I have not made my mind up. But I have read the reports. . . . In fact, I ordered the examination based upon the information I got. And after those examinations were made, I looked at the reports to see what they said. And I'm assuming the doctors will basically testify here in person as they have written in their reports. Now, if they don't, then that's another matter. And there may be other things the Defense presents to me that may indicate that he's incompetent to stand trial. But I don't think that's any indication that I'm biased at this time. But if you would like to put your objections on the record, you certainly can."
Defense counsel then objected that he believed the trial court was biased and predisposed to find Brown competent to stand trial; therefore, defense counsel requested that another judge determine Brown's competency.
A few days later a competency hearing was held before the trial court at which Dr. D'Errico and Dr. McKeown testified concerning their evaluations. An extensive report published by Dr. James Hooper, who had evaluated Brown during his earlier stay at Taylor Hardin Secure Medical Facility, was also introduced into evidence. At the conclusion of the State's evidence during the competency hearing, Brown moved to suspend his trial and asked the court to order Brown to be *578 transported to Taylor Hardin Secure Medical Facility for another determination of competency to stand trial. In support of his motion, defense counsel argued that Brown's conduct throughout the competency hearing had clearly indicated that he could not participate in the trial, because Brown had spoken out and conducted himself in an unruly and distracting manner. Defense counsel argued: "[H]is behavior in the courtroom and the adjoining rooms is such that clearly, judge, there has to be doubt in the Court's mind as to his competency." Defense counsel also indicated that even the State's expert was in agreement that Brown suffers from some mental and psychological problems. The prosecutor responded that Brown had been sent to Taylor Hardin on two previous occasions and had been found competent to stand trial. The prosecutor also noted that both of these examining experts found that Brown malingers and uses his behavior to attempt to obtain what is "best for him." The prosecutor argued: "He acts out when he thinks he can get something out of it." The trial court thereafter denied Brown's motion and found that he was competent to stand trial.
The trial court properly found reasonable grounds for an examination of Brown's mental condition by a psychiatrist and ordered him examined in a state institution. Rule 11.3(a), (b), Ala. R.Crim. P. Pursuant to the Alabama Rules of Criminal Procedure, following such examination, the trial court may, in its discretion, order a defendant to be examined again when the evaluating psychologist or psychiatrist deems that such examinations may be necessary.
"The circuit court may, in its discretion, appoint additional experts and may order the defendant to submit to physical, neurological, or psychological examinations, when the court is advised by the examining psychologist or psychiatrist that such examinations are necessary for an adequate determination of the defendant's mental condition."
Rule 11.3(d), Ala. R.Crim. P.
In the present case, the trial court was not advised by the examining psychiatrist and psychologist that any additional examinations were "necessary for an adequate determination of the defendant's mental condition." Therefore, the trial court had no authority to order another evaluation, Bentley v. State, 904 So.2d 351, 361 (Ala.Crim.App.2004), writ denied, 904 So.2d 365 (Ala.2005), and therefore did not err in denying Brown's motion. Moreover, there is no indication of bias by the trial court in its determination of competency. Rather, the trial court clearly indicated that, although before the competency hearing, he had reviewed the reports and evaluations by the experts and was aware of their findings, he had made no conclusions or determinations until all of the evidence was presented at the competency hearing.

III.
Brown argues that he was denied his right to confront witnesses during cross-examination because of allegedly improper admission into evidence of medical records from Taylor Hardin Secure Medical Facility. Brown apparently refers to three reports made by Dr. D'Errico, as well as reports by Dr. Hooper and Dr. McKeown. However, because Dr. D'Errico was present during the competency hearing as a defense witness and Dr. McKeown testified during the competency hearing as a State's witness, they were both available for questioning concerning the reports. Therefore, Brown's argument as to his denial of his right to confrontation is only applicable to the evidence contained in the report by Dr. Hooper.
*579 The record of the competency hearing indicates that, while questioning Dr. D'Errico, the prosecutor marked and offered all of the reports from Taylor Hardin Secure Medical Facility. He stated that he was doing so in order to be able to adequately cross-examine Dr. D'Errico, who testified that he had based part of his assessments of Brown on the reports of Dr. Hooper and Dr. McKeown. No ruling is reflected in the record concerning this offer, and Brown did not object. The prosecutor continued to question Dr. D'Errico concerning his reliance on the report of Dr. Hooper and how his conclusions differed from those of Dr. Hooper. The questions concerning Dr. Hooper's report were clearly for impeachment purposes. Subsequently, when the State presented its evidence at the competency hearing, the prosecutor, in examining Dr. McKeown, referred to the report by Dr. Hooper. Defense counsel then objected to the witness's testifying to anything contained in the report, and the prosecutor responded that, because the report had previously been offered and admitted, his objection was untimely. The trial court overruled Brown's objection. The prosecutor then continued to question Dr. McKeown as to the similarity between the conclusions he drew upon examining Brown and those of Dr. Hooper, as contained in his report.
The record further stated that all of these reports were contained in the trial court's file, which had been put together for examination by the trial court to use in determining whether there was a question concerning Brown's competency that might merit investigation and a hearing. Rule 11.3, Ala. R.Crim. P.
Rule 11.2(b)(2), Ala. R.Crim. P., states:
"The results of examinations conducted pursuant to subsection (a)(1) of this rule, Rule 11.3, or Rule 11.4 on the defendant's mental competency to stand trial shall not be admissible as evidence in a trial for the offense charged and shall not prejudice the defendant in entering a plea of not guilty by reason of mental disease or defect."
The Committee Comments to Rule 11.2 (as amended effective October 1, 1996) state:
"Subsection (b)(1) which is similar to Rule 12.2(c), Fed.R.Crim.P., and 18 U.S.C. § 4241, makes it clear that the determination of the defendant's competency to stand trial is separate and distinct from the determination of his sanity at the time of the offense. To ensure this factual distinction and to avoid any prejudice to the defendant, the finding of the defendant's competency to stand trial is specifically made inadmissible in the trial for the offense charged."
Thus, the Alabama Rules of Criminal Procedure make it clear that evidence that is appropriately considered in determining the competency of a defendant to stand trial cannot be admitted during the case-in-chief, because of the prejudice the defendant may suffer where he has entered a plea of not guilty by reason of mental disease or defect. However, such evidence is clearly relevant in the consideration of the finder of fact concerning competency. Cf. Minor v. State, 780 So.2d 707, 727-28 (Ala.Crim.App.1999), rev'd on other grounds, 780 So.2d 796 (Ala.2000) (in which the appellant's contention that the trial court improperly allowed the State to use the results of his mental examination to determine competency to stand trial during a bond hearing was held not to constitute error as the results were not admitted into evidence at trial such that they could have had an unfair prejudicial impact on the jury's deliberations). Reports by psychiatrists or psychologists appointed by a court or the Department of Mental Health and Mental Retardation are required to be *580 submitted to the circuit judge pursuant to Rule 11.3(c), Ala. R.Crim. P. Thus, because the trial court had already seen the reports in the process of determining whether Brown was entitled to a competency hearing, Brown suffered no prejudice by the admission of the reports during the competency hearing before the trial court.
Brown has failed to establish any error, plain or otherwise, concerning the admission into evidence during the competency hearing of the reports from Taylor Hardin Secure Medical Facility.

IV.
Brown argues that he was denied his rights to due process as the result of the trial judge's failure to recuse himself. Brown acknowledges his heavy burden in overcoming the presumption that the trial judge was impartial and unbiased, as well as the general rule that the judge's improper conduct made in the absence of, or without the knowledge of, the jury is not reversible error because the conduct could not have influenced the jury's decision. However, Brown argues that because the trial judge deprived the jury of the opportunity to determine Brown's competency to stand trial, leaving the determination to be made by a trial judge who had expressed his intent to find Brown competent prior to conducting a competency hearing, the judge should have recused himself.
"`The burden is on the party seeking recusal to present evidence establishing the existence of bias or prejudice. Otwell v. Bryant, 497 So.2d 111, 119 (Ala. 1986). Prejudice on the part of a judge is not presumed. Hartman v. Board of Trustees, 436 So.2d 837 (Ala.1983); Duncan v. Sherrill, 341 So.2d 946 (Ala. 1977); Ex parte Rives, 511 So.2d 514, 517 (Ala.Civ.App.1986). "`[T]he law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea.'" Ex parte Balogun, 516 So.2d 606, 609 (Ala.1987), quoting Fulton v. Longshore, 156 Ala. 611, 46 So. 989 (1908). Any disqualifying prejudice or bias as to a party must be of a personal nature and must stem from an extrajudicial source. Hartman v. Board of Trustees of the University of Alabama, 436 So.2d 837 (Ala.1983); Reach v. Reach, 378 So.2d 1115 (Ala. Civ.App.1979). Thus,
"`"`[T]he disqualifying prejudice of a judge does not necessarily comprehend every bias, partiality, or prejudice which he may entertain with reference to the case, but must be of a character, calculated to impair seriously his impartiality and sway his judgement, and must be strong enough to overthrow the presumption of his integrity.'"
"`Ross v. Luton, 456 So.2d [249] at 254 [(Ala.1984)], quoting Duncan v. Sherrill, 341 So.2d 946, 947 (Ala.1977), quoting 48 C.J.S. Judges § 82(b).'"
Hodges v. State, 856 So.2d 875, 898 (Ala. Crim.App.2001) (opinion on return to remand), aff'd, 856 So.2d 936 (Ala.2003), quoting Ex parte Melof, 553 So.2d 554, 557 (Ala.1989).
In the present case, Brown finds bias in the trial judge's statement that he was leaning toward finding Brown competent "unless something jumps out at me and changes my mind." However, this statement is pulled out of context. An examination of the entire dialogue between the trial judge and defense counsel indicates that the trial judge stated that any feeling that he had concerning Brown's competency, at the time of that discussion, was based on the reports of the examinations of by the experts as to Brown's competency *581 to stand trial. However, the trial judge further stated that he intended to hold a hearing, at which he would consider all the evidence and, if the evidence so merited, find Brown not competent to stand trial. The trial judge fully indicated during his discussion with defense counsel that he had not yet "made [his] mind up." Clearly, this was not a situation where the trial judge's conduct could influence the jury's decision; neither was there any indication that his prejudice or bias was of a personal nature and stemming from any extrajudicial source. Pursuant to the Alabama Rules of Criminal Procedure, reports by experts on mental examinations to determine competency are to be delivered to the trial judge for the judge's examination. The trial judge is presumed to review these reports to determine whether there is a question of competency and need for a competency hearing. Just as a veniremember is not required to be totally ignorant of a case in order to be an effective finder of fact, so long as he can listen to all of the evidence and make his determination thereon, a trial judge is not required to be ignorant of information in the experts' reports concerning competency prior to the competency hearing, so long as he hears all of the evidence and makes his determination based on that evidence. Moreover, a trial judge is aware of the witnesses who are to testify at the hearing and whether he has reports from all or most of them.
Moreover, a review of the trial judge's conduct throughout the trial indicates a great deal of patience and indulgence in dealing with Brown, who persistently spoke out during the proceedings, often in an offensive and distracting manner. A review of the rulings by the court throughout the proceedings before and during trial also show no indication of bias against Brown.
"In Baker v. State, [906] So.2d [210] (Ala.Crim.App.2001), this Court stated:
"`"The trial judge has a duty to be thorough, courteous, patient, punctual, just and impartial. Yet, at the same time it must be remembered that he is a `human being, not an automaton or a robot.' Allen v. State, 290 Ala. 339, 342, 276 So.2d 583 (Ala.1973). In light of all of the circumstances of this case, we find that the actions and comments of the trial judge were not so prejudicial as to require a mistrial or cause a reversal of this conviction."
"`Oglen v. State, 440 So.2d [1172] at 1176 [(Ala.Crim.App.1983)]. Despite the great deal of care and caution a trial judge must exercise in discharging his duties, "`he is not required to be a "Great Stone Face" which shows no reaction to anything that happens in his courtroom. Allen v. State, 290 Ala. 339, 276 So.2d 583 (1973).' Gwin v. State, 425 So.2d 500, 506-07 (Ala. Cr.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983)." Arnold v. State, 601 So.2d 145, 153 (Ala.Crim.App.1992).'
"[906] So.2d at [213]."
Jolly v. State, 858 So.2d 305, 315-16 (Ala. Crim.App.2002).
We find no abuse of discretion by the trial judge in his decision not to recuse himself based on alleged bias.

V.
Brown argues that the trial court abused its discretion in denying his motion to videotape his person throughout the proceedings. The record indicates that, on numerous occasions, defense counsel objected to restraining Brown in a special chair in the courtroom. Defense counsel argued that he also made this motion in order to preserve for appeal the behavior, mannerisms, *582 and appearance of Brown during the proceedings.
Before trial, defense counsel made a motion and was granted a hearing concerning the nature of Brown's restraints at trial. During the hearing, the State introduced copies of jail records concerning the violent behavior and safety concerns surrounding Brown. The record supervisor of the Houston County jail testified to the authenticity of the records and that they were kept in the regular course of the jail's business. She further testified that Brown had threatened to take a deputy's weapon. Further, she testified that Brown had assaulted a female officer, had threatened other officers, and had grabbed her before as well. She testified that he had broken one or two pairs of handcuffs at the jail and had also started a fire at the jail. She also testified that he had ripped himself out of a straightjacket, as well as had cursed and struck several correctional officers. She testified that he had been placed in a cell with a padlock because he had managed to pick the locks on other jail cells. She testified concerning several fights between Brown and other inmates, who she indicated were afraid of him. She also stated that, most of the time, he had been kept in handcuffs and/or foot or leg irons in order to restrain him from engaging in violent behavior.
Another witness, a sergeant employed at the Houston County jail, testified that when she had attempted to remove Brown, who was handcuffed, from his cell, he had kicked her in the chest. She further stated that she had heard him state that "if he is convicted that he will do any means he can and that he's going to make them kill him or he's going to kill as many as he can." There was also testimony that Brown was perhaps the most dangerous inmate ever to be housed in the Houston County jail. Thereafter, the trial court denied Brown's request that he be released from the restraint chair.
The record contains a photograph taken by defense counsel of Brown restrained in the chair during the proceedings. Defense counsel further continued to make oral motions that Brown be released from the chair at various times during the pretrial motions, at the beginning of trial, and during the presentation of the defense at trial. During the hearings on these motions, there was testimony with extensive descriptions of the chair and Brown's restraints. There was also testimony that, on the night before his hearing concerning his request that he be released from the restraint chair, Brown had been involved in a fight at the jail. The record also contains reams of vulgar and distracting comments made by Brown throughout the proceedings. Moreover, the pretrial proceedings were interrupted when Brown's father began taking pictures of Brown restrained in the chair.
"`"`"Every court has power to preserve and enforce order in its immediate presence; to prevent interruption, disturbance, or hindrance to its proceedings; and to control all persons connected with a judicial proceeding before it."' Thomas v. State, 555 So.2d 1183, 1184-85 (Ala.Cr.App.1989), quoting Clark v. State, 280 Ala. 493, 497, 195 So.2d 786 (1967), appeal dismissed, cert. denied, 387 U.S. 571, 87 S.Ct. 2071, 18 L.Ed.2d 967 (1967). `"While recognizing that an accused generally has a right to be tried without being subjected to physical restraints, and that this right has been embodied in various constitutional and statutory guaranties, the courts have also recognized that this right is subject to exception, especially on such grounds as the *583 need to prevent (1) the accused's escape, or (2), the accused's resort to violence, or (3) the accused's disruption of the trial."' Thomas, 555 So.2d at 1185, quoting Annot., 90 A.L.R.3d 17, 23 (1979)."
"`Wood v. State, 699 So.2d 965, 966 (Ala.Cr.App.1997). See also Martin v. State, 51 Ala.App. 405, 286 So.2d 80, 84 (1973).
"`In Campbell v. State, 484 So.2d 1168, 1170 (Ala.Cr.App.1986), this Court concluded that no abuse of discretion resulted from the trial court's requirement that the appellant be handcuffed during his trial. We noted that the appellant in that case "had substantial reason to attempt to escape, since he faced a sentence of life without parole, considering his five previous bank robbery convictions, and the charges against him in this case." See also McWilliams v. State, 640 So.2d 982 (Ala.Cr.App.1991), aff'd in part, remanded on other grounds, 640 So.2d 1015 (Ala.1993).'
"Minor v. State, 780 So.2d 707, 784 (Ala. Crim.App.1999), rev'd on other grounds, 780 So.2d 796 (Ala.2000).
"`"The trial court can best determine what security measures are necessary. `Within constitutional limits, great weight must be accorded the discretion of the trial court. The trial judge is responsible for maintaining order in his courtroom. He understands infinitely better than we what is necessary to perform his duty.' Goodwin v. State, 495 So.2d 731, 733 (Ala.Crim.App.1986)."'
"Duke v. State, 889 So.2d 1, 17 (Ala. Crim.App.2002), quoting Windsor v. State, 683 So.2d 1027, 1033 (Ala.Crim. App.1994), aff'd 683 So.2d 1042 (Ala. 1996).
"The Alabama Supreme Court in 1877 recognized that there are instances when a defendant may lawfully be physically restrained during trial proceedings. See Faire v. State, 58 Ala. 74 (1877). Since that time we have upheld a trial court's decision to restrain disruptive or potentially disruptive defendants. See Goodwin v. State, 495 So.2d 731, 733 (Ala.Crim.App.1986) (upheld restraint of defendant who was a `repeat felon with a history of escape'); Martin v. State, 51 Ala.App. 405, 286 So.2d 80 (1973) (no error in ordering defendant who had escaped from federal prison to be restrained); Clark v. State, 280 Ala. 493, 195 So.2d 786 (1967) (upheld restraining defendant who attempted to escape during trial)."
Snyder v. State, 893 So.2d 488, 512-13 (Ala.Crim.App.2003), writ denied, 893 So.2d 563 (Ala.2004).
In the present case, there was no abuse of discretion by the trial court in requiring that Brown be restrained in the chair, during trial proceedings. Brown was clearly dangerous and violent, and the restraints were necessary for the safety of the individuals present in the courtroom. Moreover, because of the ample evidence contained in the record of the manner of restraint used on Brown, the defense suffered no prejudice from the trial court's refusal to allow videotaping of Brown during the proceedings.

VI.
Brown argues that the trial court committed reversible error in denying his motion made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The record indicates that following the striking of the jury, defense counsel made a Batson motion, alleging that the State removed four black veniremembers from the panel solely because they were *584 African-American. The trial court asked the State to respond, which the prosecutor declined to do; defense counsel then argued that he had made a prima facie case of racial discrimination. The trial court then stated that, out of an abundance of caution, it would require the State to give their reasons.
The prosecutor responded that juror no. 107, a black male, was struck because he had a nephew and grandson who were retarded and who suffered mental problems. He noted that he had struck juror no. 171, a white female, because she had stated that she had family members suffering from depression. Thus, the prosecutor argued that he had struck a white veniremember for the same reason. The prosecutor stated that juror no. 186, a black male, was struck because the State had information that he had been convicted of a crime, specifically, carrying a pistol without a permit. The prosecutor also referred to a white veniremember who was struck because he had been convicted of reckless endangerment; thus, the white veniremember had been struck for the same reason as the black veniremember. Juror no. 204, a black male, was struck because the State had information that he had been convicted three times of driving under influence and public drunkenness. Juror no. 200, a black female, was struck because the State had information that she had been convicted of receiving stolen property in the first degree. The prosecutor further argued that the three black veniremembers and one white veniremember who were struck because of their prior convictions, also failed to respond when asked whether they had previously been convicted of an offense. Thus, the prosecutor argued that this was also a reason for striking them. Thereafter, the trial court denied the Batson motion.
On appeal, Brown argues that these strikes were racially motivated and submits that the trial court should have required the State to provide proof of the convictions forming the basis of the strikes of three of the four black veniremembers. Moreover, Brown argues that the white potential juror whom the prosecutor stated that he had also removed based on his conviction was in fact one of the three alternates in the case. Thus, he argues, this potential juror was not struck from the jury. Rule 18.4(g)(3) ("The last person or persons struck shall be the alternate or alternates. . . ."). In the present case, the original 12 jurors served throughout the trial and sentencing, without the need for the alternates to serve.
The prosecutor's reason for striking the three black veniremembers based on information concerning prior convictions was a valid and race-neutral reason. Even a suspicion that a potential juror was involved in or connected with criminal activity can be a sufficiently race-neutral reason for a strike.
"`A connection with or a founded suspicion of criminal activity can constitute a sufficiently race-neutral reason for the exercise of a preemptory strike. Stephens v. State, 580 So.2d 11 (Ala.Crim. App.1990), aff'd, 580 So.2d 26 (Ala.1991); Powell v. State, 548 So.2d 590 (Ala.Crim. App.1988), aff'd on other grounds, 548 So.2d 605 (Ala.1989); Lynn v. State, 543 So.2d 704 (Ala.Cr.App.1987), aff'd, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). This connection with or suspicion of criminal activity includes the juror in question, as well as close relatives and friends of the juror. Stephens; Allen v. State, 555 So.2d 1185 (Ala.Crim. App.1989); Lynn."'
Baker v. State, 906 So.2d 210, 255 (Ala. Crim.App.2001), rev'd on other grounds, *585 906 So.2d 277 (Ala.2004), quoting Heard v. State, 584 So.2d 556, 560 (Ala.Crim.App. 1991). See also McGriff v. State, 908 So.2d 961, 981 (Ala.Crim.App.2000), rev'd on other grounds, 908 So.2d 1024 (Ala. 2004) ("Peremptory strikes based on the criminal record of a prospective juror do not violate Batson. Darby v. State, 601 So.2d 117 (Ala.Crim.App.1989).").
Moreover, although Brown argues that the trial court should have required the prosecutor to produce proof of the convictions of the potential jurors, there is no merit to this contention. It should also be noted that Brown did not request production of those documents at trial.
"The State has no duty to disclose information concerning prospective jurors. As we stated in Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), quoting Kelley v. State, 602 So.2d 473 (Ala.Crim. App.1992):
"`"This Court has held that arrest and conviction records of potential jurors do not qualify as the type of discoverable evidence that falls within the scope of Brady and that a trial court will not be held in error for denying an appellant's motion to discover such documents. Slinker v. State, 344 So.2d 1264 (Ala.Cr.App. 1977). Cf., Clifton v. State, 545 So.2d 173 (Ala.Cr.App.1988) (the nondisclosed evidence was not exculpatory, thus Brady was inapplicable). In other words, the appellant does not have an absolute right to the disclosure of the arrest and conviction records of prospective jurors. See Slinker, supra. Cf., Davis v. State, 554 So.2d 1094 (Ala.Cr.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), rehearing overruled, 569 So.2d 738 (Ala.1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (defendant is not entitled to the general disclosure of the criminal records of the state's witnesses); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1982) (No absolute right to disclosure of criminal records of state's witnesses).
"`"Several jurisdictions have similarly held. See e.g., People v. Murtishaw, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982)(trial judge has discretionary authority to permit defense access to jury records); Moon v. State, 258 Ga. 748, 375 S.E.2d 442 (1988), cert. denied, 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991) (trial court did not err in denying defendant's motion for pretrial discovery of state's juror information records); State v. Wiggins, 556 So.2d 622 (La.App.1990) (defendant is not necessarily entitled to `rap sheets' of prospective jurors); State v. Weiland, 540 So.2d 1288 (La.App.1989) (defendant is not entitled to rap sheets of prospective jurors because those records are useful to state in its desire to challenge jurors with inclinations or biases against state, but are not pertinent to purpose of defendant's voir dire: to challenge jurors who defendant believes will not approach the verdict in a detached and objective manner); State v. Childs, 299 S.C. 471, 385 S.E.2d 839 (1989) (no right to discovery of criminals records of potential jurors absent statute or court rules requiring such disclosure); Jeffrey F. Ghent, Annot., Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.3d 571, § 4(a) (1978), and the cases cited therein.

*586 "`"Also, the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr. App.1985). Here, the appellant could have procured this information from the veniremembers themselves during voir dire. See also Clifton, supra (nondisclosure did not prejudice appellant's defense)."'
"711 So.2d at 1080."
McGriff v. State, 908 So.2d at 981.
The other reason espoused by the prosecutor for striking potential jurors who had criminal convictions  that they failed to respond when questioned as to whether they had any prior convictions  was clearly a race-neutral reason, based on the honesty and forthrightness of the potential jurors. "It is fundamental to our system of impartial justice that `"[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes."'" State v. Freeman, 605 So.2d 1258, 1259 (Ala.Crim.App.1992) (quoting Ex parte O'Leary, 438 So.2d 1372, 1373 (Ala.1983), quoting in turn Ex parte O'Leary, 417 So.2d 232, 240 (Ala.1982)). Apicella v. State, 809 So.2d 841, 851 (Ala.Crim.App. 2000), aff'd, 809 So.2d 865 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 706 (2002). See also Wright v. State, 678 So.2d 1216 (Ala.Crim.App.1996).
The final black veniremember who was struck by the State was removed because he had a nephew and grandson who both had mental problems. The prosecutor noted that he had removed a white veniremember for the same reason. Smith v. State, 838 So.2d 413, 430 (Ala. Crim.App.2002), cert. denied, 537 U.S. 1090, 123 S.Ct. 695, 154 L.Ed.2d 635 (2002) (indicating a lack of racial bias in use of peremptory challenges where white veniremembers were removed for the same reason). See also Wimberly v. State, 934 So.2d 411 (Ala.Crim.App.2005); Jones v. State, 895 So.2d 376, 378 (Ala.Crim.App. 2004). Further, under the facts of the present case  Brown had been treated for mental disease and all of the experts were in agreement that Brown was suffering from some form of psychotic illness  a veniremember with a connection to mental illness might have had greater sympathy for Brown. Thus, under the facts of this case, such a reason for a prosecutorial strike would be race neutral. See Talley v. State, 687 So.2d 1261, 1270 (Ala.Crim. App.1996) (holding not Batson violation where veniremember was stuck because she was seeing a psychiatrist for treatment of depression, which may have caused her to give "substantial credence to a psychologist's testimony, which is a gender-neutral reason in this case," because the prosecutor "knows that the appellant's defense will primarily be based upon expert psychological testimony"). See also Bass v. State, 585 So.2d 225, 237 (Ala.Crim.App.1991) (upholding the trial court's decision that the striking of a nurse because she had relatives who had suffered a nervous breakdown was a race-neutral reason under the circumstances of the particular case).
Although Brown in his brief alleges that the prosecutor failed to engage the three black veniremembers with prior convictions in any form of meaningful voir dire, it was unnecessary to ask these potential jurors any further questions. The record indicates that the entire panel was questioned at length by both parties and that neither party was deprived from asking any potential juror any submitted question. There was no confusion concerning this matter; no further questioning was requested. Similarly, Brown's contention in brief that the Houston County District *587 Attorney's Office has a historical pattern of engaging in racially based striking of potential jurors is without support, and, where the trial court waived the need to establish a prima facie of discrimination, evidence of such a pattern was unnecessary.
The reasons given by the prosecutor were racially neutral, and there was no error by the trial court in denying Brown's Batson motion. "A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Thomas, 659 So.2d 3 (Ala.1994); Lynn v. State, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989)." Talley v. State, 687 So.2d at 1267.

VII.
Brown argues that he was denied his rights to due process by the trial court's removing him from the courtroom during his competency hearing, as well as during his trial. Specifically, Brown argues that he should have been allowed to remain in the courtroom during his competency hearing, because, he says, his demeanor was strong evidence that he could not cooperate in his defense and was, therefore, not competent to stand trial. Brown further argues that the trial court violated Rule 9.2, Ala. R.Crim. P., when he was removed from the proceedings during the case-in-chief without being afforded the opportunity to return during these proceedings or the opportunity to view the proceedings and consult with his attorney.

A.
Brown argues that he was improperly removed from the courtroom during his competency hearing based on his disorderly conduct because, he says, that very conduct was strong evidence that he was in fact incompetent to stand trial. The record is full of examples of Brown's inability to conduct himself in an appropriate manner during courtroom proceedings by making inappropriate and often offensive comments, noises, and gestures. The nature of Brown's behavior, as well as his prior violent conduct, required that he be restrained in a special chair while in the courtroom. The record indicates that prior to the competency hearing, the trial court had become well aware of Brown's disruptive conduct through observation during earlier hearings and proceedings. The record is full of references to these earlier occasions wherein Brown either spoke out inappropriately or engaged in other peculiar conduct, including one episode wherein he had shaved his hair in an unusual manner, so that the trial court was clearly on notice of the nature of Brown's demeanor. The trial court had attempted to be patient and to endure Brown's conduct; however, because Brown's actions were interfering with both parties' ability to conduct orderly proceedings, he was removed from the courtroom and placed in an adjacent room. While housed in the nearby room, the record indicates that Brown continued to scream and to make a great deal of noise in order to disrupt the proceedings.
Rule 9.2, Ala. R.Crim. P., addresses the effect of a defendant's disruptive behavior during trial or courtroom proceedings as follows:
"(a)Disruptive Conduct. If a defendant engages in disruptive or disorderly conduct so that the trial or other proceeding cannot be carried on in an orderly manner, the court, after having warned the defendant of the consequences of such conduct may, if such conduct continues, order the defendant to be bound and gagged, or otherwise *588 restrained or removed from the trial or proceeding. If the defendant continues such disruptive or disorderly conduct after warning, he shall be deemed to have forfeited the right to be present at that trial or proceeding."
The committee comments to the Rule indicate that this Rule establishes a preference for removing, rather than binding and gagging, a defendant. The exception stated, which refers to a capital defendant, addresses only his presence during sentencing. Thus, a capital defendant can lose his right to be present at trial if he persists in disruptive behavior. Ex parte Clemons, 720 So.2d 985, 989 (Ala.1998).
A defendant's right of presence is derived from the Sixth Amendment to the United States Constitution and Due Process Clauses of the Fifth and Fourteenth Amendments, establishing his right to confront witnesses against him. United States v. Gagnon, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). In the present case, Brown makes no claim that his defense counsel was not effective in, or was in any way prohibited from, questioning the witnesses or objecting to or responding to evidence presented at the competency hearing. Moreover, he makes no assertion that his presence would have aided his defense counsel in confronting the witnesses and the evidence. Rather, Brown argues that he was prejudiced by his absence because his conduct was not observable. However, the competency hearing was held before the trial court, and the record fully discloses that the trial court was aware of Brown's demeanor and behavior. Therefore, any further demonstrations of peculiar conduct or outbursts would have been redundant and merely cumulative of Brown's prior acts in the courtroom.
"In Illinois v. Allen, [397 U.S. 337, 346-47 (1970)], the trial judge had removed the defendant from the courtroom after repeated warnings concerning his unruly conduct. The United States Supreme Court wrote:
"` . . . [O]ur courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and the orderly progress thwarted and obstructed by defendants brought before them and charged with crimes. . . . Being manned by humans, the Courts are not perfect and are bound to make some errors. But, if our courts are to remain what the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct paraded before the . . . trial judge in this case.'"
Baker v. State, 906 So.2d at 231-32.
During the competency hearing, Brown was not denied his right to confrontation or his right to due process; defense counsel conducted a thorough and effective examination of the witnesses and evidence pertaining to Brown's ability to stand trial. Moreover, Brown was not prejudiced by being prevented from continuing his unruly and disruptive behavior during the competency hearing. Brown was present during the testimony of his first witness, Dr. D'Errico, and began engaging in continued interruptions, making such statements as: "I gotta pee-pee"; "Today is my birthday, Judge"; "I didn't do that"; "I am going to shoot him"; "I'm going to trick him up to the edge"; "I caught a fish. I caught a fish, big `ole fish, big `ole fish "; "I want the candy. I want the *589 candy." Brown further referred to the trial judge as "[A] judge fish. A lady judge fish," and continually laughed. He then began cursing, pretending to fish, and demanding "Goddamn candy." During the cross-examination of this Dr. D'Errico, Brown was still disrupting proceedings and continued to speak out, calling the prosecutor "mean" and stating that he "got me a nigger fish." Brown's interruptions escalated, and he began taunting the prosecutor, stating, "I bet my ding-dong is bigger than yours"; "I am not dangerous"; "I didn't do that, motherfucker"; "Why you fucking with me?" The prosecutor continued questioning the defense expert as to whether he was aware that, according to witnesses who had spent a great deal of time with him, Brown could control his behavior. Brown's interruptions grew more frequent and more hostile. The following transpired just before Brown was removed from the courtroom:
"[Brown]: Put him in the chair. Put him in the chair. Tie him up in the chair.
"[Prosecutor]:  or appearance during those hearings, what is different now, is it because he's now facing the electric chair, could that be the reason?
"[Dr. D'Errico]: It could be.
"[Brown]: I don't care if the they put me in the electric chair, motherfucker. I ain't scared of the electric chair.
"The Court: All right. Take him out.
"[Brown]: Son of a bitch. I want to go to the electric chair. I'll be with my wife and kids. If I go to the electric chair, I'll be with my wife and kids, you motherfucker.
"[Defense counsel]: Judge, may we approach?
"[Prosecutor]: This is outside the presence of the jury. I mean
"[Defense counsel]: We object to Mr. Brown being removed from the court-room. The defense counsel wasn't questionedwasn't conferred with in any way. It was the Court's order that they remove him. We object to that.
"[Prosecutor]: Bring him back. It doesn't bother the state.
"The Court: You know, I have bent over backwards. He's been over there acting up, and I am not going to have it when he starts cussing. I mean, the defense a day ago argued that he shouldn't be in restraints, and then through Dr. D'Errico basically he's saying he should be in restraints. You can't have your cake and eat it too. You want him here, but you don't want him here. You want him in restraints, but you don't want him in restraints. The defense just argues to object whenever it's not their situation. I don't want him in here cussing, and I'm not going to have it. All right. Let's go. Let's move on."
Thereafter, Brown was removed from the courtroom.
Thus, the record clearly demonstrates that Brown's disruptive and willful behavior necessitated his removal from the courtroom. Morever, he suffered no prejudice from the trial court's inability to further observe his outbursts.

B.
Brown further argues that the trial court improperly had him removed from the courtroom during the case-in-chief without allowing him the opportunity to return, and without affording him any opportunity to hear or view the trial or to communicate with his attorneys during the trial, in violation of Rule 9.2, Ala. R.Crim. P.
The record indicates that, just before counsel's opening statements, the trial court made the following statement concerning Brown's removal because of his *590 disruptive behavior during pretrial matters:
"The Court:. . . . Now, let me put this on the record, since we have had some dealings yesterday about whether Mr. Brown should be here, just to make sure that the record reflects why he was excluded. I'm not sure if I ought to put the reasons in there, but I need to. As I understand, though, during the first couple of days of this trial the court reporter did take down some of the comments of Mr. Brown, if she could. He was commenting while everyone else was talking.
"But, at first, he was rather good about things. He commented just once in a while. But he got worse and worse to the extent that he was actually disrupting things in the courtroom, and I couldn't hear the attorneys. And, in fact, when I did put him out, he started cussing. That was the last straw as far as I am concerned. And the comment I made yesterday wasn't done facetiously. I don't know if the record reflects this or not. Mr. Brown had constantly been over there expelling gas, and then making little comments about it. So that is why I put that in the record."
Brown remained in the courtroom, but again began making inappropriate comments. Before the lunch break on the first day and during the testimony of a state witness who was attempting to identify an item of evidence, the following transpired:
"[Brown]: Identify that pistol holster I had.
"[Prosecutor]: Did you see him with a pistol?
"[Witness]: I just saw his hands behind his back.
"[Brown]: Identify the holster. What would I have needed to have a gun behind my back for, if I got a holster?
"[Defense counsel]: Your Honor, may we approach?
"[Brown]: Tell the truth, man.
"(Whereupon, the following occurred out of the hearing of the jury.)
"[Defense counsel]: Your Honor, I am at a bit of a loss. I would ask that the jury be excused and that you address
"[Brown]: I am telling the truth. I am sorry.
"The Court: Mr. Brown, I am trying to listen to your lawyer, okay.
"[Brown]: Yes, sir. Yes, sir. I am sorry. Show her the pistol
"[Defense counsel]: I would ask the jury be excused, and that the court address Mr. Brown and caution him about not making statements in court such as he is making now.
"[Brown]: That is your house. Something behind my back. Come on, man. Man, I want to get on the stand. I want to get on the stand.
"The Court: Do you want him excused?
"[Defense counsel]: I want the court to caution Mr. Brown himself.
"[Brown]: Y'all are playing with the judge. I want to get on the stand to defend my damn self. That is my right to.
"[Defense counsel]: I ask that after this witness is excused, when we break for lunch, can we have a hearing about this?
"The Court: Well, I have already told him two or three times not to talk.
"[Brown]: That is all I want, man, is everyone to know the truth.
"[Defense counsel]: The attorneys would like to be heard on this matter, judge.
"The Court: So do you want him out?
"[Defense counsel]: No, sir. I want to be heard on the issue of him speaking out in court. And what I have requested *591 the court do. But I am fine on waiting until after this witness.
"The Court: All right.
"[Brown]: Hey, your Honor, can I just take the stand and be through with this shit? I am going to chill on out and be quiet.
"The Court: Mr. Brown. Take Mr. Brown out, please.
"Mr. Brown: Y'all don't want them to know the truth. Y'all don't want them to know the truth. If I have a gun, why would I have a gun and I didn't shoot her, instead of tie her up, stupid motherfucker."
Brown was removed from the courtroom.
Shortly after Brown was removed from the courtroom, defense counsel asked to address the court and stated that he believed that Brown was receiving ineffective representation because "he is uncontrollable," and "he is unmanageable." Defense counsel argued that because Brown "continues to act out in a manner that is contrary to his best interest," he was causing his attorneys to represent his interests ineffectively. The trial court responded as follows:
"The Court: Well, that is easy to solve. You can put him out, and you don't have to be ineffective. But you're going to have to make that decision. You are going to have to make the decision, [Defense counsel], what you want. If not, I'm going to utilize my prerogative. And I did put him out, because he started cussing again."
Defense counsel then argued that he believed that the trial court should make the decision and again argued that Brown was incompetent. In response, the prosecutor noted that Brown had been making statements concerning evidence and wanting to testify, clearly indicating that he was competent and that he could help his attorneys. Defense counsel again argued that Brown was rendering counsel's representation ineffective and the trial court responded, "I have just made y'all effective because I put him out, okay. And as far as I'm concerned, he'll stay out. So y'all are now rendered effective counsel for Mr. Brown." Defense counsel objected to Brown's absence on the basis that it violated his constitutional rights, but further stated that "we understand the Court's ruling."
The trial continued without Brown's presence, until the State rested its case. Defense counsel then, two days later, moved the court to allow Brown to be present in court. The trial court informed defense counsel that if Brown were to return to the courtroom and not misbehave, the State would be able to argue that his disruptive behavior was intended to thwart its case, especially because he would be remaining composed during defense counsel's presentation. Defense counsel then stated that the trial court should decide whether Brown should be present according to Rule 9.2., Ala. R.Crim.P. The trial court asked defense counsel if Brown planned to testify, and defense counsel responded that the decision had not yet been made. Defense counsel further indicated that Brown had voiced his desire to be present. The trial court then agreed to allow Brown back into the courtroom. Thereafter, Brown remained in the courtroom for the rest of the guilt phase of the trial, as well as the penalty phase.
Despite Brown's argument to the contrary, he was not permanently removed from the courtroom during the trial. Although Brown argues that he was not given the right, after he was removed, to show the court that he would not disrupt the proceedings, he had in fact been given several such opportunities. The record *592 shows that the trial court was extremely patient with the rantings of and the distractions caused by Brown. Brown was warned on numerous occasions and instructed by the trial court several times to improve his behavior; however, he continued to disrupt the proceedings. Moreover, the trial court was clearly sensitive to Brown's argument of incompetency, as is indicated in his suggestion to defense counsel that Brown's return to the courtroom for the presentation of his case might make his claim of incompetency appear fraudulent if his behavior were to improve during the presentation of his defense. Brown was not prejudiced by his removal for the two days of trial, because he was being a distraction not only to the jury but also to his own defense counsel, who indicated that because of Brown's outbursts they were unable to hear the testimony being presented.
Further, the trial court did not violate Rule 9.2(c), Ala. R.Crim. P., by denying Brown his rights to be informed of the trial proceedings from which he had been excluded and to communicate with his counsel. Brown did not object on this ground at the trial level; therefore, this argument on appeal is analyzed pursuant to the plain-error standard. Rule 45A, Ala. R.App. P. The language of Rule 9.2(c), establishes that, once removed from the proceedings, the accused should be provided with the ability to hear, observe, or be informed of the remaining portions of the trial or proceedings and to communicate with his counsel at reasonable intervals. Thus, the provisions are stated alternatively, and, in the present case, Brown was clearly being informed by his counsel of the happenings and was communicating with his counsel. Defense counsel was able to argue that Brown wished to return, clearly indicating that the counsel had spoken with Brown. There is no indication in the record that Brown was prevented from conferring with his counsel during the times that he was absent. Therefore, there is no error on this ground, plain error or otherwise.
In State v. Chapple, 103 Wash. App. 299, 12 P.3d 153 (2000), aff'd, 145 Wash.2d 310, 36 P.3d 1025 (2001), the trial court heard testimony concerning the defendant's "proclivity for dangerousness and violence," 103 Wash.App. at 310, 12 P.3d at 159, and then considered options concerning the defendant's participation during trial. The court ultimately decided that exclusion "was the only real option that would maintain order in the courtroom." Id. In reviewing the trial court's determination, the Washington Court of Appeals stated, "`There is no . . . constitutional requirement that a court try its luck with other sanctions before excluding a disruptive defendant. . . .' United States v. Beasley, 72 F.3d 1518, 1530 (11th Cir. 1996). `[N]o formalistic sequence of warnings is required. Nor is it necessary for more than one warning to be given. . . .' Scurr v. Moore, 647 F.2d 854, 858 (8th Cir.1981)(quotation and citation omitted)." Id.
"A defendant's right to be personally present during trial may . . . be forfeited or waived by his disruptive behavior. Illinois v. Allen, 397 U.S. 337, 342-43, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970); Badger v. Cardwell, 587 F.2d 968, 970 (9th Cir.1978). Since `[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country[,]' Allen, 397 U.S. at 341, 90 S.Ct. at 1061, `a defendant can loose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself *593 in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom.' Id. at 343, 90 S.Ct. at 1060-61. `Once lost, the right to be present can . . . be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.' Id.

"Here, the record is replete with instances in which petitioner acted contumaciously and showed no respect for the legal proceedings or the trial judge. During the trial, petitioner was frequently argumentative, often interrupted the court proceedings, made inflammatory statements about various witnesses and the trial judge, and injected many baseless objections, causing the trial judge to admonish petitioner on myriad occasions."
El v. Lamarque, 293 F.Supp.2d 1107, 1112-13 (2003) (footnotes omitted).
In the present case, the trial court properly determined that Brown had lost his right to be present during periods of the trial, after having been warned countless times by the judge that he would be removed if his disruptive behavior continued, and he nevertheless insisted on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial could not be carried on with him in the courtroom. Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

VIII.
Brown argues that he was denied due process of the law because of the trial court's ex parte communications with a jailer and his resulting order to physically restrain Brown throughout the trial. Specifically, Brown argues that the trial court engaged in ex parte communications with a jailer who requested that Brown be strapped to a chair based on allegedly unspecified problems the jailer had had with Brown at the jail. Brown argues that the use of the chair gave "haunting visions of a man sitting in the electric chair," and that a less visible means of restraint should have and could been employed.
The record indicates that before voir dire examination of the jury panel, defense counsel objected to Brown's being restrained and guarded in the courtroom during the trial. He specifically objected to the use of the restraint chair, which included a seatbelt and restraints around Brown's legs. Defense counsel argued that it was his understanding that Brown was strapped into the chair because of a statement he had made concerning his desire to refrain from changing clothes. The trial judge responded that he had information regarding past difficulties in controlling Brown and further attested to the fact that he had encountered Brown "hollering" before entering the courtroom. The prosecutor responded with jail records concerning Brown's threat to get a gun and shoot "whoever he needs to shoot" in order to avoid the electric chair. The State introduced evidence through witnesses and documentation of prior acts of violence by Brown against jailers as well as fellow inmates while he was incarcerated. The State also introduced evidence of the necessity to restrain Brown in prison, especially where he was able to "pick" the locks of jail cells and escape. Jail personnel testified that they were afraid of Brown and that he was the most dangerous and violent prisoner that they had encountered. Moreover, the State suggested that Brown could be seated at the defense table and that drapes could be placed over the table thereby concealing the restraints; however, defense counsel disapproved of the drape.
*594 In Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), the United States Supreme Court reviewed a decision by the Supreme Court of Missouri affirming a trial court's decision to allow a capital defendant, who was being resentenced to death, to appear before the jury shackled in leg irons, handcuffs, and a belly chain. The Court held that the United States Constitution prohibits the use of shackles where they are visible to a jury, during a capital trial's penalty phase, as it does during a guilty phase, unless the use of such restraints is "`justified by an essential state interest  such as the interest in courtroom security  specific to the defendant on trial.' Holbrook v. Flynn, 475 U.S. 560, 568-569 [(1986)]." Deck v. Missouri, 544 U.S. at 623, 125 S.Ct. at 2009. In Deck v. Missouri, the Court examined the historical use of restraints on a criminal defendant during trial. The court acknowledged that this issue falls under the due-process guarantees of the Fifth and Fourteenth Amendments and that the Court has recently held that the Constitution does permit "special measures, including physical restraints" to be used during trial on "an unusually obstreperous criminal defendant." Deck v. Missouri, 544 U.S. at 627, 125 S.Ct. at 2011, citing Illinois v. Allen, 397 U.S. 337, 343-44, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Thereafter, the Court also held that it was not unconstitutional to have security personnel present in the courtroom to address the special concern of courtroom security. Id., citing Holbrook, 475 U.S. at 568-69, 106 S.Ct. 1340. Examining the policies of lower courts as to the constitutionality of restraining defendants during a criminal trial, the Court stated:
"Courts and commentators share close to a consensus that, during the guilt phase of a trial, a criminal defendant has a right to remain free of physical restraints that are visible to the jury; that the right has a constitutional dimension; but that the right may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum. See, e.g., Dyas v. Poole, 309 F.3d 586, 588-589 (C.A.9 2002) (per curiam); Harrell v. Israel, 672 F.2d 632, 635 (C.A.7 1982) (per curiam); State v. Herrick, 324 Mont. 76, 78-82, 101 P.3d 755, 757-759 (2004); Hill v. Commonwealth, 125 S.W.3d 221, 233-234 (Ky.2004); State v. Turner, 143 Wash.2d 715, 723-727, 23 P.3d 499, 504-505 (2001) (en banc); Myers v. State, 2000 OK CR 25, ¶ 19, 17 P.3d 1021, 1033; State v. Shoen, 598 N.W.2d 370, 374-377 (Minn.1999); Lovell v. State, 347 Md. 623, 635-645, 702 A.2d 261, 268-272 (1997); People v. Jackson, 14 Cal.App.4th 1818, 1822-1830, 18 Cal.Rptr.2d 586, 588-594 (1993); Cooks v. State, 844 S.W.2d 697, 722 (Tex. Crim.App.1992); State v. Tweedy, 219 Conn. 489, 504-508, 594 A.2d 906, 914-915 (1991); State v. Crawford, 99 Idaho 87, 93-98, 577 P.2d 1135, 1141-1146 (1978); People v. Brown, 45 Ill.App.3d 24, 26-28, 3 Ill.Dec. 677, 358 N.E.2d 1362, 1363-1364 (1977); State v. Tolley, 290 N.C. 349, 362-371, 226 S.E.2d 353, 365-369 (1976); see also 21A Am.Jur.2d, Criminal Law §§ 1016, 1019 (1998); see generally J. Krauskopf, Physical Restraint of the Defendant in the Courtroom, 15 St. Louis U.L.J. 351 (1970-1971); ABA Standards for Criminal Justice: Discovery and Trial by Jury 15-3.2, pp. 188-191 (3d. ed.1996)."
544 U.S. at 628, 125 S.Ct. at 2012.
The Court further stated that lower courts have disagreed concerning the procedural steps to be undertaken before allowing such restraint, but concluded that in order to ensure that a criminal defendant be accorded his due-process rights, a trial court, when exercising its discretion, *595 is justified in allowing restraints only where a state interest specific to the particular trial is implicated; specifically, courts should look to such factors as have traditionally been relied upon, such as "gauging potential security problems and the risk of escape at trial." 544 U.S. at 629, 125 S.Ct. at 2012.
In Alabama, it has consistently been held that:
"`Bringing a prisoner before the bar of justice in handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial.' Brock v. State, 555 So.2d 285, 288 (Ala.Crim.App.1989), on return to remand, 580 So.2d 1390 (Ala.Crim.App. 1991). The decision to restrain a defendant rests with the trial judge, and, absent an abuse of discretion, this Court will not disturb his ruling on appeal. Id. at 289. `Ultimately, however, it is incumbent upon the defendant to show that less drastic alternatives were available and that the trial judge abused his discretion by not implementing them.' Id. (internal citation and quotation marks omitted). `It is not always reversible error for a defendant to be handcuffed or shackled in front of the jury.' Perkins v. State, 808 So.2d 1041, 1079 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143, 1145 (Ala.2001)."
McCall v. State, 833 So.2d 673, 676 (Ala. Crim.App.2001), (holding that, although the trial judge failed to state his reasons for requiring an inmate witness to testify in shackles and prison clothing, Brown failed to show that he had suffered any prejudice). See also Brock v. State, 555 So.2d 285, 289 (Ala.Crim.App.1989) (holding that, although the facts of that case did not "explicitly indicate a fear by the court that the defendant would attempt to escape, it is not reversible error for a trial court to allow a defendant to be brought into the courtroom handcuffed").
In Alabama, it is clear that espoused state concerns of safety in the courtroom, as well as the prevention of a defendant's escape, are legitimate concerns that properly justify the use of restraints. Thus, in Peraita v. State, 897 So.2d 1161, 1208 (Ala. Crim.App.2003), aff'd, 897 So.2d 1227 (Ala. 2004), this court held that the trial court properly allowed the defendant to be shackled, based on his prior convictions and sentences, for safety purposes and because he might try to escape. In holding that there was no plain error by the trial court for allowing this defendant to appear in shackles, this court stated:
"Moreover, `[i]t is not always reversible error for a defendant to be handcuffed or shackled in front of the jury.' Perkins v. State, 808 So.2d 1041, 1079 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830, on remand, 851 So.2d 453 (Ala.2002). In fact, `[i]t is in the sound discretion of the trial court to restrain the defendant, and such discretion should not be disturbed, Martin v. State, 51 Ala.App. 405, 286 So.2d 80, 85 (1973).' Brock v. State, 555 So.2d 285, 289 (Ala.Crim.App.1989). Finally,
"`"`[e]very court has power to preserve and enforce order in its immediate presence; to prevent eruption, disturbance, or hindrance to its proceedings; and to control all persons connected with the judicial proceeding before it.'" Thomas v. State, 555 So.2d 1183, 1184-85 (Ala.Cr.App. 1989), quoting Clark v. State, 280 Ala. 493, 497, 195 So.2d 786 (1967), appeal dismissed, cert. denied, 387 U.S. 571, 87 S.Ct. 2071, 18 L.Ed.2d 967 (1967). "`While recognizing that an accused generally has a right to be tried without *596 being subjected to physical restraints, and that this right has been embodied in various constitutional and statutory guaranties, the courts have also recognized that this right is subject to exception, especially on such grounds as the need to prevent (1) the accused's escape, or (2) the accused's resort to violence, or (3) the accused's disruption of the trial.'" Thomas, 555 So.2d at 1185, quoting Annot., 90 A.L.R.3d 17, 23 (1979).'
"Wood v. State, 699 So.2d 965, 966-67 (Ala.Crim.App.1997)."
Peraita v. State, 897 So.2d at 1208.
In the present case, the trial court restrained Brown in response to its proper concerns of escape, resort to violence, and disruption of the trial. Through the testimony of prison personnel, there was ample evidence of Brown's quickness to resort to violence, as well as his ability to escape. Brown's disruption of trial was acknowledged by all parties concerned. Thus, the trial court acted properly in restraining him.
Moreover, the form of restraint used was not excessive under the circumstances. Brown clearly had an ability to pick locks and there was evidence of his strength. In United States v. Battle, 173 F.3d 1343 (11th Cir.1999), the defendant had been sentenced to life in prison following his conviction of first-degree felony murder, aggravated sexual abuse, and second-degree murder. While in prison prior to trial, he brutally killed a correctional officer with a hammer and, thereafter, committed three separate instances of violence. Because of the defendant's history of violence, the trial court determined that precautions were required based on safety concerns. The defendant's legs were shackled and a black belt with a Velcro closing was used to restrain his hands. He also wore a prison jumpsuit, because he refused to wear civilian clothing. However, the tables were draped to hide the shackles, and the defendant wore a black sweater to conceal the black belt restraining his hands. Similarly, the defendant in Deck v. Missouri, supra, was restrained with handcuffs, leg irons, and a belly chain.[1] Although the restraining chair was an extreme measure, the trial court did not abuse his discretion in determining that this was the best means of restraint in the present case.

IX.
Brown argues that the State failed to present sufficient evidence to prove beyond a reasonable doubt that he intended to kill Virginia Keel, in order to sustain a conviction for capital murder. Specifically, Brown argues that his statements indicate that he had no intent to kill the victim and, in fact, that he did not know that she had died. Moreover, he argues that, although he was carrying a loaded gun, he never used it and only bound and gagged Keel in an effort to keep her quiet.
However, the record amply supports the jury's finding that Brown had a particularized intent to kill the victim. During the offense, Brown threatened to kill the victim several times, initially to prompt her to give him money, and, thereafter, to prevent her from attempting to scream or escape. Brown pointed his loaded gun at the victim. He subsequently "hog-tied" his 83-year-old victim and tightly and extensively gagged her with a *597 T-shirt and thick black tape, so that her dentures were shoved back into her mouth.
The question of whether a defendant had the specific intent to commit a murder may be gleaned from the circumstances surrounding the offense and therefore constitutes a matter best suited to a jury's determination. Peraita v. State, 897 So.2d at 1210-11.
"Furthermore,
"`"[a]n intent to cause the death of the deceased may be inferred from the character of the assault, the use of a deadly weapon and all other attending circumstances surrounding the death of the deceased." Fears v. State, 451 So.2d 385, 387 (Ala.Crim. App.1984). See also Swann v. State, 412 So.2d 1253 (Ala.Crim.App.1982); Tucker v. State, 383 So.2d 579 (Ala. Crim.App.) cert. denied, 383 So.2d 586 (Ala.1980)'
"Weaver v. State, 678 So.2d 260, 277 (Ala.Cr.App.1995), rev'd, 678 So.2d 284 (Ala.1996).
"`In Jones v. State, 591 So.2d 569, 574 (Ala.Cr.App.1991), this court stated:
"`"`[T]he element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, [and] it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.'" Johnson v. State, 390 So.2d 1160, 1167 (Ala.Cr.App.), cert. denied, 390 So.2d 1168 (Ala. 1980). Accord Fears v. State, 451 So.2d 385, 387 (Ala.Cr.App.1984); Young v. State, 428 So.2d 155, 158 (Ala.Cr.App.1982).'"
"`Additionally, in Bishop v. State, 482 So.2d 1322, 1326 (Ala.Cr.App.1985), this court held:
"`"`Intent may be presumed from the act of using a deadly weapon. McArdle v. State, 372 So.2d 897 (Ala.Crim.App.), cert. denied, 372 So.2d 902 (Ala.1979), and from the character of the assault, including the nature and amount of force used in the fatal injury. Flint v. State, 370 So.2d 332 (Ala.Crim.App.1979).'
"`"`Chaney v. State, 417 So.2d 625, 627 (Ala.Crim.App.1982). . . . . In Underhill on Criminal Evidence, § 540 (3d ed.1923), we find the following statement regarding proof of intent in an attempted murder charge:
"`"`Thus, as a general rule, the force or violence which was employed must be proven to have been intentional. . . . The intention to do great bodily harm, to murder or commit any other crime by means of an assault, may be inferred from the circumstances. Circumstantial evidence is usually the only available evidence of intention aside from the declarations of the accused. The intention may be inferred from the force or direction, or from the natural or contemplated result of the violence employed, from the weapon or implement used by the accused, from his threats or prior conduct towards the person assaulted, and generally from the extent and effect of the injury inflicted, or from any deliberate action which is naturally attempted and usually results in danger to the life of another.'"'
"Long v. State, 668 So.2d 56, 60 (Ala.Cr. App.1995). Finally,
"`"[I]ntent may be inferred from the use of a deadly weapon. Fears v. State, 451 So.2d 385 (Ala.Crim.App. 1984); Young v. State, 428 So.2d 155 (Ala.Crim.App.1982). . . . Further, circumstantial *598 evidence alone may be sufficient in conjunction with other facts and circumstances which tend to connect the accused with the commission of the crime to sustain a conviction. Dolvin v. State, 391 So.2d 133 (Ala.1980) and cases there; Cumbo v. State, 368 So.2d 871 (Ala.Crim.App. 1979), cert. denied, 368 So.2d 877 (Ala. 1979)."'
"Buskey v. State, 650 So.2d 605, 609 (Ala.Cr.App.1994)."
Hutcherson v. State, 727 So.2d 846, 852-53 (Ala.Crim.App.1997), aff'd, 727 So.2d 861 (Ala.1998).
In the present case, the jury was properly charged by the trial court as to determining intent. Moreover, there was ample circumstantial evidence to support the jury's determination that Brown had the specific intent to kill the victim.

X.
Brown argues that the trial court erred in denying his motion to suppress his statements made to law-enforcement officers, because he was in custody when the statements were made, but was never read his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Brown further argues that he should have been advised of his Miranda rights because he was the only suspect in a capital-murder case. Brown specifically refers to his statement concerning the location of the gun that was in his possession and the statements he made while riding with a police officer to the police station.

A.
The record indicates that Brown's statement concerning the location of the gun was clearly voluntary and initiated by Brown in return for exposure to the media. During the testimony of Sgt. Tony Luger, the witness testified that, after Brown had been taken into custody at the victim's residence and placed in a patrol car, officers began searching for the gun. Brown first indicated to authorities that he had thrown the gun in a wooded area beside the victim's apartment. However, the gun was not located in that area. Shortly thereafter, Brown indicated to the police officers that he would tell them where the gun was, if they allowed him to talk on channel 4, a television broadcast channel. Sgt. Luger testified that no threats or promises were made in return for the information of the gun, other than to grant Brown's request to make a statement to the media. Sgt. Luger further testified that Brown then showed the officers where the gun had been placed in the garbage can in the kitchen of the victim's apartment, and, in return, Brown was allowed to make a statement to the channel 4 news crew. On cross-examination, Sgt. Luger testified that he had not spoken to Brown prior to being informed that Brown was requesting to be interviewed by channel 4 and that he would reveal the location of the gun if he was granted an interview. On redirect examination, Sgt. Luger was asked, "Did you initiate in any way, you, yourself, or the Dothan Police Department any conversations with Anthony Brown about that weapon?" Sgt. Luger responded that he did not and that Brown had initiated the request.
On appeal, the State does not deny that Brown was in custody at the time he made his statement to the channel 4 news crew and revealed the location of the gun; however, the State argues that the location of the gun was not given pursuant to interrogation. The State also argues that the officer's conduct in attempting to discover the location of the gun falls under an exception to Miranda v. Arizona, for these situations that pose a threat to the safety *599 of the public. The State refers to testimony by Sgt. Luger that his "main focus at the time" was to find the gun "because that apartment complex has several children that [live] in there, and we had been unsuccessful in our attempts to recover the weapon, and for their safety to keep any child or anybody else from finding a loaded gun out in the wooded area, that was my main focus at that time to recover that pistol for the safety of the people of the apartments."
A review of the totality of the circumstances surrounding this statement by Brown reveals that Brown's statement concerning the location of the weapon was not made as a result of interrogation and that it was voluntarily given. Brown initiated the bargain, whereby he would reveal the location in return for an interview with a television news crew.
"`[T]he test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by "apprehension of harm or hope of favor." See [Ex parte] Gaddy, 698 So.2d [1150] at 1154 [(Ala.1997)] (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe [v. Connecticut], 367 U.S. [568] at 602, 81 S.Ct. [1860] at 1879 [(1961)]; Jackson [v. State], 562 So.2d [1373] at 1380 [(Ala.Crim.App. 1990)]. To determine if a defendant's will has been overborne, we must assess "[t]he conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure"; "[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures." Jackson, 562 So.2d at 1380-81 (citations omitted).'
"McLeod v. State, 718 So.2d 727, 729-30 (Ala.), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998)(footnotes omitted.). See also Craig v. State, 719 So.2d 274 (Ala.Cr.App.1998)."
Minor v. State, 780 So.2d 707, 730-31 (Ala. Crim.App.1999), rev'd on other grounds, 780 So.2d 796 (Ala.2000).
There is no indication that Brown's will was overborne by his hopes of being interviewed by the news crew for channel 4 or that the police officer's agreement to allow Brown to speak to the news crew created irresistible pressure that led to Brown's revealing the location of the weapon. The record does not "support a finding that an `exertion of physical or psychological force or any particular and peculiar susceptibility to inducement' occurred to induce" Brown to make the statement. Minor v. State, 780 So.2d at 732.
In Maples v. State, 758 So.2d 1 (Ala. Crim.App.1999), aff'd, 758 So.2d 81 (Ala. 1999), the appellant argued that his statements were involuntary because they were made pursuant to an officer's comments concerning his curiosity about the case and the whereabouts of the murder weapon. In holding that the appellant did not make his statements during interrogation or because of police coercion, this court stated:
"`[I]n the absence of "compelling influences, psychological ploys, or direct questioning," the "possibility" that an accused will incriminate himself, even the subjective "hope" on the part of the police that he will do so, is not the functional equivalent of interrogation.' Burgess v. State, [827] So.2d [134] (Ala. Cr.App.1998) (citing Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987)). We do not find that Officer *600 Mason's comments about his curiosity concerning the case and the whereabouts of the gun were intended to prompt an incriminating response from the appellant. Rather, the appellant was engaged in a `custodial conversation' with Mason, as opposed to a `custodial interrogation,' when he volunteered information to Mason concerning his involvement in the murders. Further, the evidence showed that appellant initiated the conversations with Mason regarding his involvement in the murders. Although the appellant was in custody when he made the incriminating statements to Mason, he had been fully advised of his Miranda rights and he volunteered the information to Mason. Based on the totality of the circumstances in this case, we conclude that the evidence supports the trial court's determination that the appellant's statements to Mason were voluntary and admissible."
Maples v. State, 758 So.2d at 43.
Similarly, in the present case, Brown initiated the conversation with the officers and bargained for an interview pursuant to a "custodial conversation" rather than a "custodial interrogation." This statement made by Brown was voluntary and was not a result of custodial interrogation.
Moreover, as argued by the state, even if the officer had asked Brown about the whereabouts of the gun, his actions would have been justified, pursuant to New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550, (1984). The Supreme Court, in New York v. Quarles, stated:
"[T]he need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them."
New York v. Quarles, 467 U.S. at 657-58, 104 S.Ct. 2626 (footnote omitted).
Thus, in Edwards v. State, 515 So.2d 86, 91 (Ala.Crim.App.1987), this court held that an officer's questions concerning the whereabouts of a gun were proper although Brown had not yet received his Miranda warnings. This court stated:
"The officers in the instant case were faced with a situation where there were a number of bystanders, they did not know where the appellant had disposed of the gun, and they were concerned that one of the victim's relatives might seek to harm the appellant. If the gun had been disposed of by appellant outside after the shooting, there was an immediate danger that someone, either a bystander or appellant, could be shot. We find that this scenario presented sufficient exigent circumstances to warrant the invocation of the `public safety' exception established in Quarles, supra.
"Therefore, whether [the officer] asked the [other] officers where the gun was and the appellant volunteered the information, or whether [the officer] directly made his inquiry of the appellant, we find that the trial court did not err in refusing to suppress the shotgun as a result of appellant's statement and directions."
Edwards v. State, 515 So.2d at 91-92.
Similarly in Landreth v. State, 600 So.2d 440, 444-45 (Ala.Crim.App.1992), this court *601 held that a warrantless search and seizure of a weapon was justified under this exception.
"In this case, the appellant admitted to the officers that he had done the shooting and told them the exact location of the weapon. Having been told that the rifle was just inside the house, but not knowing whether anyone else was in the house, Chief Vincent acted reasonably to protect himself, his fellow officers, and several bystanders by stepping in front of the appellant, entering the premises, seizing the rifle, and leaving the house immediately thereafter. According to the facts as recited above, Vincent's taking possession of the murder weapon did not constitute an unreasonable search and seizure and thus did not violate the appellant's Fourth Amendment protections. See, e.g., Pope v. State, 367 So.2d 998 (Ala.Cr.App. 1979)."
Landreth v. State, 600 So.2d at 444-45.
In the present case, the officers would have been justified in questioning Brown concerning the whereabouts of the weapon because the weapon could have been tossed into a wooded area next to an apartment complex where children were living and a child or other third party could have discovered the loaded weapon.

B.
Brown also argues that the statements he made in the patrol car, while riding to the police station, should have been suppressed as he had not yet been advised of his Miranda rights. The record indicates that a recording device, located within the patrol car, taped Brown's statements made while he was being transported from the crime scene to the police station. A transcription of these statements is included in the record and indicates that Brown was not being questioned, but rather that the statements were spontaneous. As the officer driving the patrol car testified, he was not questioning Brown, but did respond to questions posed by Brown on a few occasions. The officer asked one follow-up question in response to a statement made by Brown. Specifically, Brown was rambling concerning his apprehension by the police officers and stated:
"And then, the way they came in with the guns, they ain't secure, his partner didn't secure him right. Cause I was sitting there  I was sitting there on them. They walked straight past one way instead of, they was supposed to V'd it off, instead of one go that way and then the other one keep straight. This motherfucker gone walk straight by me. And I'm sitting here, I going, damn I could have just shot that motherfucker. I mean he gone keep straight."
The driving officer responded, "Which one is that you would have shot?" Brown stated that he would have shot the first officer who came into the house. Otherwise, Brown made extensive statements concerning the offense, but none in response to questioning or interrogation.
"`"`If the defendant spontaneously volunteers information, either before or after being given the Miranda warnings, those statements need not be suppressed.' United States v. Edwards, 885 F.2d 377, 387 (7th Cir.1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App.1985) (`An unsolicited remark, not in response to any interrogation, does not fall within the Miranda rule.'); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.[1992]) (`The protections afforded a suspect under [Miranda] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, *602 is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings.'), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).
"`"`Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda].'
"`"Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). See also Britton v. State, 631 So.2d 1073, 1078 (Ala.Cr.App.1993); Williams v. State, 601 So.2d 1062, 1072 (Ala.Cr.App.1991)."'"
Maples v. State, 758 So.2d at 42-43, quoting Ex parte Clark, 728 So.2d 1126, 1132 (Ala.1998), quoting in turn Worthington v. State, 652 So.2d 790, 792-93 (Ala.Crim. App.1994).
Because Brown was spontaneously volunteering information, his statements do not fall within the Miranda rule and were properly admitted into evidence.

XI.
Brown argues that Alabama's capital-sentencing statute violates the Sixth Amendment of the United States Constitution, citing Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556, (2002), and Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
Specifically, Brown asks this court to overturn the Alabama Supreme Court's decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), and also argues that he should not be executed based on the United States Supreme Court's decision in Atkins v. Virginia, supra.
As to Brown's request that we overturn the Alabama Supreme Court's decision in Ex parte Waldrop, supra, this court has recently stated:
"The State correctly argues that this Court is bound by the decisions of the Alabama Supreme Court. § 12-3-16, Ala.Code 1975. Even if we were persuaded by [the appellant's] arguments on this issue, and we are not, we could not somehow issue a ruling in opposition to Ex parte Waldrop. See Barber v. State, 952 So.2d 393, 461 (Ala.Crim.App. 2005)."
Beckworth v. State, 946 So.2d 490, 515 (Ala.Crim.App.2005).
Brown also argues that he should not be executed, based on the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which designated the execution of mentally retarded defendants as cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Brown further argues that he should be classified as mentally retarded because, in 1990, he had scored a 76 on the Wechsler Intelligence Scale for Children, Revised, which has a margin of error of plus or minus 5 points. Brown further submits that his unruly conduct in court, particularly his outbursts, indicates that he is mentally retarded. However, Brown made no argument at the trial court level that he was mentally retarded. Rule 45A, Ala.R.App.P. Brown's sentencing hearing in front of the jury was held in late April 2002; he was sentenced by the trial court in May 2002. The United States Supreme Court released its decision in Atkins v. Virginia on June 20, 2002. Therefore, this issue is to be reviewed *603 pursuant to a plain-error analysis, as in Ex parte Perkins, 851 So.2d 453, 455 (Ala.2002).
In Alabama, several cases have addressed the issue whether a criminal defendant, facing the possibility of a death penalty, should be determined to be mentally retarded for the purposes of Atkins v. Virginia, supra. In Beckworth v. State, 946 So.2d at 508-09, this court stated:
"In Atkins v. Virginia, the United States Supreme Court held:
"`We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," we therefore conclude that such punishment is excessive and that the Constitution "places a substantive restriction on the State's power to take the life" of a mentally retarded offender.'
"Atkins v. Virginia, 536 U.S. 304 (2002).
"As Alabama's appellate courts have reviewed cases in which capital defendants have argued that they are mentally retarded, certain standards have been consistently applied:
"`The court [in Atkins] did not define a legal standard for mental retardation, but left the definition of the term and enforcement of the newly announced rule to the states. The Alabama Legislature has yet to enact a statute to address the holding in Atkins. The only Alabama statute that provides assistance in making this determination is § 15-24-2(3), Ala.Code 1975, which defines a "mentally retarded person" as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments."
"`The Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala. 2002), in determining whether the appellant was mentally retarded and therefore not subject to execution, applied the broadest definition of mental retardation recognized in those states that prohibit the execution of the mentally retarded. The Court stated:
"`"Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."'
"Yeomans v. State, 898 So.2d 878, 901 (Ala.Crim.App.2004). See also Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___, ___ (Ala.2003)(`Because the Legislature has not had an occasion to address the State's policy regarding mentally retarded capital defendants and establish a procedure for determining whether a capital defendant is mentally retarded and therefore not subject to the death penalty, we have conducted our review in light of the most liberal definitions considered by the United States Supreme Court in reaching its holding in Atkins and as defined by statutes in those states that prohibit the imposition of the death sentence on a mentally retarded defendant.' (Footnote omitted.))"
In Ex parte Perkins, supra, as in the present case, the appellant did not assert *604 at trial that he was mentally retarded. Although Brown argued that he was incompetent to stand trial based on his psychotic and violent behavior, the appellant's evidence indicated that he suffered from psychotic and delusional episodes as well as patterns of depression, but not that he was mentally retarded. The appellant's past treatment had been based on this evaluation. There was no evidence indicating that Brown was mentally retarded.
Dr. McKeown testified that he was aware that Brown had demonstrated problematic behavior during his adolescence and had been placed in a number of different facilities. He testified that he had reviewed records from those facilities that referred to basic achievement testing that had indicated that Brown had been functioning "in the borderline range of intellectual abilities" and "indicated he [had been] functioning in the school out there at the 5th to 7th grade level." Dr. McKeown stated that, at the time of this finding, Brown would have been 15 to 17 years old. He further testified that on January 8, 1980, Brown was administered an IQ test and that he had a verbal IQ of 80, a performance IQ of 75, and full scale IQ of 76. In August 1992, he was administered the Kauffman Assessment of Intellectual Function and was determined to be "functioning anywhere from a 3rd grade, 7 month level in spelling up to 7th grade, 7 month level with regard to basic comprehension. His math application skills were almost at a high school level." Dr. McKeown further testified, when asked if such an IQ test would assess his IQ at the time of trial, the witness responded:
"My opinion would be that his intellectual function may be slightly higher than that. Sometimes individuals of African-American background don't score quite as high on formal testing. And I suspect that those scores may have been a little suppressed. They may have been indicative of how he was functioning when he was fourteen years old. But, functionally, my assessment of him would be that he functions at a higher level now."
Also contained in the record is a report by the Houston County Department of Human Resources concerning Brown while he was a student at the Selma Street School. The record indicates that Brown was a "very likeable child" who enjoyed outdoor sports, especially basketball and football, as well as indoor board games and playing cards. The report states that Brown "does verbalize his feelings very well and feels unafraid of telling the truth even when he knows it may mean some type of disciplinary action." The report states that, although his parents had reported he had a problem with stealing small items, that problem appeared to be resolved. Following an incident in which Brown committed a theft, he was placed with another family, and the report indicates that Brown seemed to almost immediately develop a good relationship with the foster mother as well as other children in the home. Brown experienced other successful relationships with foster parents as well as with one of his aunts.
The record also contains report cards of Brown's 7th- and 8th-grade school years. In the 7th grade, although Brown failed science, social studies, and spelling, he received a 72 in mathematics and a 75 in reading. In the 8th grade, Brown received B's in math, science, English, vocabulary, and physical education, while he received a "C" in social studies.
As to Brown's adaptive behavior, Dr. D'Errico and Dr. McKeown both testified that Brown exhibited malingering behavior in his responses during interviews. Both experts testified that Brown manipulated his responses to alter his scores and evaluations. *605 There was evidence indicating that Brown could pick the locks of his handcuffs as well as jail cells. There was also evidence indicating that Brown had learned to swallow razor blades and regurgitate them without injury to himself. There was also testimony from prison guards that Brown was able to control his behavior when it suited him. There was testimony that Brown filed a federal lawsuit against the guards at the jail; however, this Court acknowledges that this lawsuit may have been drafted by another inmate acting as a "jailhouse lawyer." However, there was also testimony from a police officer who stated that, following the present offense, Brown indicated that he had gotten away with such offenses in the past by getting sent to mental facilities, and he would do so in the instant case. The record is replete with evidence indicating that Brown was adept at manipulation and well aware of the workings of the judicial system. There was also evidence in the record indicating that Brown maintained a number of jobs and that he had had one significant relationship with a female.
In Ex parte Perkins, supra, the Alabama Supreme Court concluded that Perkins was not mentally retarded based on evidence from an expert clinical psychologist and neuro-psychologist that, as an adult, Perkins had a full score IQ of 76, with a verbal score of 80 and a performance score of 74; further, the Court noted that Perkins's intellectual functioning had probably declined as he had aged because of his abuse of alcohol. The expert did not conclude that Perkins was mentally retarded. 851 So.2d at 456. Moreover, there was no evidence of "significant" or "substantial" deficiencies in Perkins' adaptive behavior before or after age 18, as required by Atkins. The Court noted that Perkins had maintained a job for a short period and that he had engaged in relationships, including a marriage for 10 years. Id. See also Burgess v. State, supra (holding that Burgess was not mentally retarded based on evidence presented during the penalty phase indicating that his IQ was between 70 and 80; that he had completed the 9th grade; that he had attended one year at the Oakley Mississippi Training School after having been convicted of a drug offense; and that he was described as cooperative and industrious).
In Beckworth v. State, supra, this court held that Beckworth was not mentally retarded under even the broadest definition given that phrase. The evidence indicated that none of Beckworth's deficits manifested before he was 18 years old; that he did not suffer significant deficits in behavior  he had a consistent employment history, had attended a technical college, and had acquired a commercial driver's license; and that, moreover, although one of his IQ tests indicated a score below 70, the other indicated that his IQ was 73.
In the present case, Brown had an overall IQ of 76, which had likely improved. Although his disruptive behavior manifested itself before he was 18 years old, the record is full of reports indicating that Brown lied, told "tall tales," engaged in miscellaneous criminal behavior, and had the ability to reform. Brown maintained employment and had some education as well as personal relationships, particularly with his girlfriend and his aunt. There is no indication in the record of mental retardation as addressed in Atkins v. Virginia, supra, or Ex parte Perkins, supra. Therefore, there is no error on this ground.

XII.
Brown argues that the trial court's finding that the instant murder was "especially heinous, atrocious, or cruel," is *606 unwarranted. Brown did not object to the trial court's sentencing order on this ground at trial. In his amended motion for new trial Brown objected to the trial court's finding only as to the other aggravating circumstance  that the murder was committed during a robbery in the first degree. Therefore, this issue must be analyzed pursuant to plain-error rule. Rule 45A, Ala. R.App. P.
"This Court has often stated:
"`"When considering whether a particular capital offense was `especially heinous, atrocious or cruel,' this Court adheres to the standard set out in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), namely, that the particular offense must be one of those `conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'" Duke v. State, 889 So.2d [1], 36 [(Ala.Crim.App.2002)].
"Yeomans v. State, 898 So.2d 878, 905 (Ala.Crim.App.2004).
"`One factor this Court has considered particularly indicative that a murder is "especially heinous, atrocious or cruel" is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture "must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering." Norris v. State, 793 So.2d 847, 861 (Ala.Crim. App.1999).
"`In Ex parte Rieber, 663 So.2d 999 (Ala.1995), the defendant stalked a convenience-store clerk for several days before he walked into the store and shot her during a robbery. There was evidence that the clerk had been aware of his presence and that she was afraid of him. This Court held that the murder was "especially heinous, atrocious or cruel" given, among other things, that the murder was perpetrated under circumstances that caused fear and pain to the victim before death. The Court specifically stated that "evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder, was heinous, atrocious, or cruel. Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989). . . ." 663 So.2d at 1003.'
"Ex parte Key, 891 So.2d 384, 390 (Ala. 2004)."
Beckworth v. State, 946 So.2d at 522-23.
"In Norris v. State, 793 So.2d 847 (Ala. Crim.App.1999), this Court identified three factors that had often been considered by Alabama's appellate courts in determining whether the evidence established this aggravating circumstance. Factors that support a finding of this aggravating circumstance include physical violence beyond that necessary to cause death, appreciable suffering after a swift initial assault, and psychological torture. Norris v. State, 793 So.2d at 854-60. We have stated that psychological torture results when the victim is in intense fear and is aware of, but helpless to prevent, impending death. Ex parte Key, 891 So.2d 384, 390 (Ala.2004)."
Scott v. State, 937 So.2d 1065, 1083 (Ala. Crim.App.2005).
The evidence presented concerning the instant murder clearly establishes the act as especially heinous, atrocious, or cruel as compared to other capital offenses, "by any reasonable definition." Turner v. State, 924 So.2d 737, 792 (Ala. Crim.App.2002). The trial court's sentencing order, containing his findings concerning this aggravating circumstance, states:

*607 "The murder was especially heinous, atrocious or cruel. The evidence showed beyond a reasonable doubt that the crime committed shocks the conscience of the Court. The hands of the victim, Mrs. Virginia Keel were wrapped approximately six times with an extension cord tied with a knot. Her hands were connected to her feet with one strand of cord, and the cord was not long enough for Mrs. Keel to stretch out her legs. She was basically `hog-tied.' A portion of a T-shirt had been stuffed in her mouth, and black duct tape had been wrapped around Mrs. Keel's head approximately fifteen to twenty times. The tape was tightened so tight around her mouth that her dentures were pushed back into her mouth. The remaining portion of the T-shirt was tied around Mrs. Keel's neck in a single knot and was tightened so tight that the police could not untie the knot, but had to cut it. Once the victim was gasping for breath, he readjusted the tape by tying it tighter."
The evidence indicated that the victim tried to escape twice during the assault. After being bound and gagged, the victim managed to remove the T-shirt from her mouth while she was crying, pleading, and begging. Brown replaced the gag and secured it with electrical tape, and moved her to another room. By Brown's own admission, he was present in the victim's apartment for approximately 30 minutes, and the victim was bound for at least 15 minutes. Brown admitted that he threatened the victim's life throughout the assault. The emergency-room physician testified that the victim suffered ligature marks on her cheeks, wrists, and ankles, and that there were multiple areas of spontaneous bleeding in her eyes, scalp, forehead, and cheeks. The restraints were so tight that her hands and feet had turned blue, and her brain was eventually deprived of oxygen because of the tightness of the gag.
The evidence establishes that the victim suffered for an appreciable amount of time following the assault and clearly endured extensive psychological torture. The amount of violence used against Mrs. Keel, a frail and elderly lady, was excessive. See Scott v. State, supra (holding that the strangulation and suffocation death of a 10-year-old victim was particularly heinous, atrocious, and cruel compared to other capital offenses); Ward v. State, 814 So.2d 899, 923-24 (Ala.Crim.App.2000) (holding that the suffocation death of an abused child was especially heinous, atrocious, or cruel compared to other capital offenses); Singleton v. State, 465 So.2d 432 (Ala.Crim.App.1983), aff'd, 465 So.2d 443 (Ala.1985) (holding that the intentional murder of a nun, who had been bound by the hands and feet with her own shoelaces and strangled with a knotted strip of towel wrapped and twisted around her neck, before being buried under a pile of rocks, was especially heinous, atrocious, or cruel).
There was no plain error by the trial court in determining that the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel" when compared to other capital offenses, pursuant to § 13A-5-49(8), Ala.Code 1975, exists in the present case.

XIII.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to review the propriety of Brown's conviction and sentence of death. Brown was indicted for, and convicted of, murdering Virginia Keel, during the commission of a burglary in the first degree, in violation of § 13A-5-40(a)(4), Ala.Code 1975.
The record reflects that Brown's sentence was not imposed under the influence *608 of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Ala.Code 1975.
The trial court's sentencing order reflects that the court found the existence of two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel, § 13A-5-49(8), Ala.Code 1975, and that the murder was committed during the course of a burglary in the first degree, § 13A-5-49(4), Ala.Code 1975. As addressed earlier in this opinion, see Part XII, the trial court properly found the existence of the aggravating circumstance that the murder in this case was especially heinous, atrocious, or cruel and, based on the evidence presented at trial and the jury's verdict, also properly found the existence of the aggravating circumstance of murder committed during a burglary in the first degree.
The circuit court found no statutory mitigating circumstance, but found the existence of the following non-statutory mitigating circumstances, which had been presented by defense counsel:
"2. [Brown] came from an abusive home.
"3. [Brown] was an emotionally disturbed young child.
". . . .
"5. [Brown] came from a dysfunctional family. There was child abuse. [Brown] suffered beatings from the time he was five years old to 15 years of age. He was once locked in a closed [sic]. He had an aggressive primitive father. His mother was an alcoholic.
"6. [Brown]'s parents were hostile.
"7. [Brown]'s mother died when he was 15 years old.
"8. [Brown] was seduced by an older woman when he was 15 years old.
"9. [Brown]'s wife and her children recently died in an automobile accident.
"10. [Brown] has been diagnosed as having mental problems early in life and was constantly under the care of DHR and SpectraCare.
"11. [Brown] suffered severe emotional distress throughout his life, but in particularly [sic] after his wife and her children were killed.
"12. [Brown] has significant psychological problems and takes a variety of medicines for same.
"13. [Brown] uses illegal drugs particularly crack cocaine, and this mixed with his mental illness produces irrational conduct.
"14. Testimony of Dr. D'Errico that [Brown] was diagnosed as having psychosis with hallucinations and hearing voices. That [Brown] had wanted to kill himself and had made several recent attempts. That [Brown] has a schizophrenic disorder with thoughts of death and suicide.
"15. Testimony that of Dr. Hooper at Taylor Hardin that [Brown] had a brief reactive psychosis and a diagnosis of adjustment and personality disorder otherwise not specified.
"16. At the age of 15 years, [Brown] was a resident in a foster home. He threatened commit suicide by placing electrical wires in his mouth.
"17. [Brown] had a number of juvenile arrests.
"18. That, four days before the crime, [Brown] was treated at the Southeast Alabama Medical Center for a suicide attempt by smoking himself to death with crack cocaine."
The circuit court weighed the aggravating circumstances and the mitigating circumstances, considered the jury's recommendation of death, and sentenced Brown to death.
*609 Pursuant to § 13A-5-53(b)(2), Ala.Code 1975, we must independently weigh the aggravating circumstances and mitigating circumstances to determine the propriety of Brown's sentence of death. Brown forced his way into his elderly victim's apartment, threatened her, bound her hands and feet, and then tied them together behind her back. He then viciously gagged her to such an extent that her dentures were thrust into the back of her throat and she was unable to breathe. This court is convinced, after independently weighing the aggravating circumstances and the mitigating circumstances, that death was the appropriate punishment in this case.
Neither was Brown's sentence disproportionate nor excessive when compared to penalties imposed in similar cases. See Beckworth v. State, supra; Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004); Neal v. State, 731 So.2d 609 (Ala.Crim. App.1997), aff'd 731 So.2d 621 (Ala.1999); Thomas v. State, 539 So.2d 375 (Ala.Crim. App.), aff'd 539 So.2d 399 (Ala.1988).
Finally, we have searched the record for any error that may have adversely affected Brown's substantial rights and have found none. Rule 45A, Ala. R.App. P.
Brown's conviction and sentence to death are due to be, and are hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] Although the United States Supreme Court reversed the conviction on the basis that the trial court erred in allowing these restraints, this decision was not based on the extent of the restraints, but rather on the determination that the trial court did not have adequate justification to have ordered the shackles.